CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

OCT 18 2010

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

DWAYNE WORKMAN,                          )
ADMINISTRATOR OF THE ESTATE OF           )
LAURA M. WORKMAN, DECEASED,              )
et al.                                   )      Civil Action No. 7:09-CV-415
                                         )
        Plaintiffs,                      )      **MEMORANDUM OPINION**
                                         )
v.                                       )      By: Hon. Glen E. Conrad
                                         )      Chief United States District Judge
JOSEPH W. BAKER, M.D., et al.            )
                                         )
        Defendants.                      )

The administrator and co-executors of the Estate of Laura M. Workman (the "plaintiffs")

filed this diversity action against Joseph W. Baker, M.D., and Carilion Medical Center (the

"defendants"), alleging that Dr. Baker negligently performed thoracic surgery upon Ms.

Workman, resulting in her injury and eventual death. This case is now before the court on the

defendants' motion to exclude the plaintiffs' preferred expert witness and motion for summary

judgment. For the reasons set forth below, the defendants' motions will be taken under

advisement until October 18, 2010.

I.      **Factual and Procedural Background**

For purposes of summary judgment, the facts are presented in the light most favorable to

the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610

(4th Cir. 1985).

On October 17, 2007, Dr. Baker, a board-certified cardio-thoracic surgeon, performed

surgery to repair Ms. Workman's descending thoracic aortic aneurysm. By all accounts, the repair

of a thoracic aortic aneurysm is always accompanied by some risk of spinal cord injury. (Ailawadi

Dep. at 28; Walker Aff. at ¶ 18.) This risk arises from the fact that, during the surgery, the operating surgeon clamps the aorta above and below the aneurysm in order to be able to repair the aorta without causing excessive blood loss. However, the usual location of the main artery that supplies blood from the aorta to the spinal cord is located between T8 and T12,[1] although it may sometimes be located as high as T2. (Ailawadi Dep. at 31; Walker Aff. at ¶ 12.) As a result, if the aneurysm is located within the T8-to-T12 region, there is an increased risk that the blood flow to the spinal cord will be cut off when the aorta is clamped during the surgery. If the spinal cord is deprived of blood for too long, there is a significant risk that the spinal cord will be injured and the patient will suffer paralysis. Accordingly, the risk of paralysis is "substantially" greater within the context of descending thoracic aortic aneurysm repairs in the T8-to-T12 region than it is with respect to the repair of descending thoracic aortic aneurysms that are located in other regions of the aorta. (Walker Aff. at ¶ 18.)

Ms. Workman's aneurysm was located between T8 and T12. During the surgery, she allegedly sustained a spinal cord injury which caused paraplegia and contributed to her death a year later. On October 9, 2009, the plaintiffs filed suit against the defendants in this court, alleging that Dr. Baker negligently failed to obtain informed consent and negligently failed to properly monitor Ms. Workman's condition during the surgery or to properly perform the surgery.

The plaintiffs have proffered William A. Walker, M.D. as their only expert witness who will testify that Dr. Baker's conduct violated the requisite standard of care. Specifically, Dr. Walker is expected to testify that Dr. Baker did not obtain Ms. Workman's informed consent for the surgery because he did not fully document or explain to her that the surgery posed a five-to-ten

---

[1]That is, in the region between the eighth and twelfth thoracic vertebrae of the spine.

2

percent risk of spinal cord injury. Dr. Walker also opines that Dr. Baker breached the standard of care relevant to the performance of this procedure because he did not use "well-documented maneuvers to mitigate against [spinal cord injury]," including "CSF drainage," "distal circulatory support," "pre-operative identification of the blood supply to the spinal cord via MRA or CTA," and "intra-operative monitoring of . . . evoked potentials." See Def. Br. Ex. B at 3.

Dr. Walker, a thoracic surgeon currently practicing in Johnson City, Tennessee, sees, evaluates, and manages patients with all types of aortic aneurysms, including descending thoracic aneurysms in the T8-to-T12 region. (Walker Aff. at ¶ 2.) However, while his surgical practice includes the repair of various kinds of aortic aneurysms, including ascending aortic aneurysms, arch aneurysms, and proximal descending aortic aneurysms, he does not perform surgery on descending thoracic aortic aneurysms located between T8 and T12. (Walker Aff. at ¶ 3.) Before 2005, Dr. Walker occasionally repaired descending thoracic aortic aneurysms located between T8 and T12. In 2005, however, he stopped performing these particular procedures because he felt that he could not maintain an appropriate level of care, given the infrequency with which his practice served these types of patients and his practice's inability to implement some of the precautionary measures he deems necessary. (Walker Dep. at 26-27.) Both parties agree that the risk of spinal cord injury is present during the repair of each of the types of aneurysms that Dr. Walker continues to repair, but is "substantially less" with respect to the repair of ascending, arch, and proximal descending thoracic aneurysms in the T3-to-T5 region than it is with respect to the repair of descending thoracic aneurysms between T8 and T12. See Walker Aff. at ¶ 18; Ailawadi Dep. at 28. Because the surgical repair of aneurysms in the T3-to-T5 region still presents some risk of spinal cord injury, however, Dr. Walker implements the same types of measures to protect the

3

spinal cord during these surgeries that he believes should have been used by Dr. Baker during his operation upon Workman, with the exception of monitoring evoked potentials. See Walker Aff. at ¶¶ 18, 19.

The case is now before the court on the defendants' two motions. The defendants' first motion claims that Dr. Walker does not meet the statutory prerequisites to testify as an expert on the relevant standard of care. Their second motion claims that, because Dr. Walker is not qualified to testify in this regard, the defendants are entitled to summary judgment, as the plaintiffs' medical malpractice action cannot survive without an expert on this issue. See Raines v. Lutz, 341 S.E.2d 194, 196 (Va. 1986) ("[E]xpert testimony is ordinarily necessary to establish the appropriate standard of care, to establish a deviation from the standard, and to establish that such a deviation was the proximate cause of the claimed damages.").

## II.     Statement of the Issues

Because the qualification of standard-of-care experts in medical malpractice cases is an issue of substantive law, Virginia law applies to the qualification of the experts proferred in this diversity case. Peck v. Tegmeyer, 834 F. Supp. 903, 909-10 (W.D. Va. 1992) (Kiser, J.). Under Virginia law, expert qualification in medical malpractice actions is governed by the statutory requirements of Virginia Code § 8.01-581.20(A). Compliance with the provisions of § 8.01-581.20(A) is mandatory. See Lloyd v. Kime, 654 S.E.2d 563, 570 (Va. 2008); Perdieu v. Blackstone Family Practice Center, Inc., 568 S.E.2d 703, 709 (Va. 2002). Still, the question whether a witness meets the dictates of § 8.01-581.20(A) and is thereby qualified to testify as an expert is "largely within the sound discretion of the trial court." Wright v. Kaye, 593 S.E.2d 307, 312 (Va. 2004) (quoting Noll v. Rahal, 250 S.E.2d 741, 744 (Va. 1979)). See also Lawson v.

Elkins, 477 S.E.2d 510, 511 (Va. 1996) ("Whether a witness demonstrates expert knowledge of the appropriate standards of the defendant's specialty is a question largely within the sound discretion of the trial court.").

Under § 8.01-581.20(A), "any physician who is licensed in some other state of the United States and meets the educational and examination requirements for licensure in Virginia" is presumed to know the statewide standard of care in the specialty or field of medicine in which he is qualified or certified. VA. CODE § 8.01-581.20(A). This presumption may be "rebutted," see Wright, 593 S.E.2d at 311, and the witness disqualified, however, if he (1) fails to demonstrate "expert knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standards" or (2) fails to show that "he has had active clinical practice in either the defendant's specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of the action." VA. CODE § 8.01-581.20(A). If, on the other hand, both statutory requisites are met, the witness "shall be qualified to testify as an expert." Id. The Supreme Court of Virginia has referred to these grounds for expert disqualification as the "knowledge requirement" and the "active clinical practice requirement." Wright, 593 S.E.2d at 311.

In the instant case, the parties do not dispute that Dr. Walker meets the educational and examination requirements of § 8.01-581.20(A). (Def. Br. at 5.) Nor do the defendants pursue any argument that Dr. Walker has not demonstrated "expert knowledge" of the standards of Dr. Baker's specialty. Id. Rather, the defendants argue that Dr. Walker is not qualified because he has not had "active clinical practice . . . within one year" of the allegedly botched operation. Despite the fact that Dr. Walker currently practices as a thoracic surgeon and consistently repairs various

5

types of thoracic aneurysms, the defendant claims that Dr. Walker has not practiced "in either the defendant's specialty or a related field of medicine" in the last year because he has not performed within that time the particular procedure at issue in this case; namely, the repair of a descending thoracic aortic aneurysm occurring between T8 and T12. The defendants assert that the enhanced risk of spinal cord injury that is present during this type of surgery differentiates it from the aneurysm operations that Dr. Walker currently performs. Concomitantly, the defendants maintain that an enhanced standard of care applies within the context of these particular procedures to the obtaining of informed consent and to the use of precautionary measures. Because Dr. Walker has not performed any of these enhanced-risk procedures within the requisite time-frame, argue the defendants, he did not engage in an active clinical practice with respect to the two standard-of-care criticisms he has made of Dr. Baker's repair of Ms. Workman's descending thoracic aortic aneurysm: the failure to take appropriate measures to reduce the risk of spinal cord injury, and the failure to obtain informed consent in light of the elevated risk of paralysis attendant to this procedure.

### III. **Applicable Law**

As noted previously, § 8.01-581.20(A) requires that an expert have an "active clinical practice" in either "the defendant's specialty or a related field of medicine." Id. The phrase "active clinical practice" has been construed narrowly to refer to the actual provision of direct patient care in the defendant's specialty or a related medical field; merely teaching and consulting with respect to the relevant medical procedure does not suffice. See Hinkley v. Koehler, 606 S.E.2d 803, 807-08 (Va. 2005); Fairfax Hosp. System, Inc. v. Curtis, 457 S.E.2d 66, 70 (Va. 1995) (excluding a witness's testimony on the standard of care governing the provision of nursing care in a neonatal

intensive care unit because he served only as the director of a medical transport service within the requisite time-frame).

In determining the scope of the phrase "related field of medicine," the Supreme Court of Virginia has observed that

> The purpose of the requirement in § 8.01-581.20 that an expert have an active practice in the defendant's specialty or a related field of medicine is to prevent testimony by an individual who has not recently engaged in the actual performance of the procedures at issue in a case. Therefore, we conclude that, in applying the "related field of medicine" test for the purposes of § 8.01-581.20, it is sufficient if in the expert witness' clinical practice the expert performs the procedure at issue and the standard of care for performing the procedures is the same.

Sami v. Varn, 535 S.E.2d 172, 175 (Va. 2000). See also Hinkley, 606 S.E.2d at 808 ("One of the purposes of [the active clinical practice requirement] is to prevent testimony by individuals who do not provide healthcare services in the same context in which it is alleged that a defendant deviated from the standard of care."). As a result, whether the witness has engaged in a clinical practice that is sufficiently related to the case at hand is "determined by reference to the relevant medical procedure." Id. at 806. However, "[the Sami court's] phrase 'actual performance of the procedures at issue in a case' is not to be given a narrow construction inconsistent with the plain terms of the statute." Wright, 593 S.E.2d at 314. Thus, it is not necessary for the witness to have performed the precise procedure "with the same pathology in all respects as gave rise to the alleged act of malpractice at issue" in order to satisfy the active clinical practice requirement. Id. Instead, "'actual performance of the procedures at issue' must be read in the context of the actions by which the defendant is alleged to have deviated from the standard of care." Id.

In Wright, for example, the plaintiff claimed that the defendant had negligently injured her bladder while using a surgical stapler during the removal of a urachal cyst. 593 S.E.2d at 312. The

trial court excluded the plaintiff's proffered experts on the grounds that they had not performed a urachal cyst surgery within the requisite time-frame and therefore did not have an active clinical practice with respect to the medical procedure at issue in the case. On appeal, however, the Supreme Court of Virgina noted that the plaintiff did not claim that the defendant was negligent in deciding to remove the cyst, but instead asserted that he was negligent in "fail[ing] to follow proper medical procedures" to prevent harm to pelvic-area organs that were at a distance from the operative field and therefore inadvertently injured the plaintiff's bladder. Id. The Court therefore reasoned that the medical procedure at issue in the case was not the performance of a "urachal cyst surgery" but rather of "laparoscopic surgery in the female pelvic area near the bladder involving a surgical stapler." Id. at 314. Because the plaintiff's witnesses had performed female pelvic laparoscopic surgery using surgical staplers within the relevant time period, the Court held that they were qualified to testify as experts on the standard of care governing that procedure, even though they had not performed a urachal cyst surgery within the requisite time-frame. Id. at 314-15.

The rationale of Wright does not depart from the Supreme Court of Virginia's practice of "consistently appl[ying] a strict interpretation to the provisions of [§ 8.01-581.20] in determining whether medical practitioners in fact qualify as expert witnesses." Whaling v. Joyce, 56 Va. Cir. 544, 546 (Va. Cir. Ct. 1997). For example, the plaintiff in Sami claimed that an emergency room physician performed a pelvic exam in a negligent manner and thereby failed to detect the fetus of a miscarried child. 535 S.E.2d at 173. The plaintiff proffered an obstetrician-gynecologist to testify as an expert to this effect, even though the expert performed pelvic exams only in the office setting and not in the emergency room setting. Id. The Court rejected the defendant's argument

that the expert did not have an active clinical practice with regard to this procedure and held that "obstetrics-gynecology and emergency medicine should be considered related fields of medicine for the purposes of § 8.01-581.20 in the instant case because the procedure at issue is performed in both specialties and the standard for performance is identical." Id. at 175.

Likewise, the plaintiff in Perdieu sought to introduce the testimony of three experts on the issue of the standard of care governing the diagnosis of fractures in nursing home patients. 568 S.E.2d at 710. The Court upheld the exclusion of all three experts, noting that none of them had diagnosed or treated any fractures whatsoever within the requisite time-frame. Id. The Court therefore held that the trial court had correctly concluded that the three experts had not engaged in an active clinical practice under § 8.01-581.20(A).

The Lloyd decision rested on similar principles. There, the plaintiff alleged that an orthopaedic surgeon was negligent in two respects: (1) in nicking his spinal cord when performing an operation on a herniated disc, and (2) in failing to recognize and properly treat the spinal cord injury after the operation. Lloyd, 654 S.E.2d at 567. The plaintiff proffered a neurologist to testify on both the intraoperative and postoperative standard of care governing the orthopaedist's conduct, and the trial court excluded him as not possessing an active clinical practice with respect to either of the procedures at issue. Id. On appeal, the Supreme Court of Virginia upheld the disqualification of the neurologist with respect to the intraoperative standard of care because the neurologist had not performed any type of spinal surgery within the requisite time-frame. Id. at 570. The Court reversed the trial court's failure to qualify the neurologist as an expert on the postoperative standard of care, however, because the neurologist consistently diagnosed this type of neurological injury in his practice and because the plaintiff "presented evidence that the

standard of care for neurologists and neurosurgeons or orthopaedists in such a scenario is the same," while the defendant "offered no evidence to contradict [the plaintiff's] evidence or suggest that there is a medical distinction between evaluation of a neurological injury post-surgery and any other time." Id. at 571. Because of "the uncontradicted testimony that the standard of care for evaluation of a neurological injury was common to neurosurgeons, orthopaedists, and neurologists," the Court held that the neurologist had an active clinical practice with respect to this postoperative procedure. Id.

In Jackson v. Qureshi, 671 S.E.2d 163 (Va. 2009), the plaintiff alleged that an emergency room doctor negligently discharged an infant who showed signs of respiratory distress and whooping cough. Id. at 165. The plaintiff proffered as an expert a pediatrician who regularly diagnosed patients with respiratory distress in an urgent care clinic but had not done so in an emergency room setting. Id. at 169. Noting that "the only relevant medical procedure at issue is [the defendant's] decision not to admit [the patient] to inpatient hospital care when the infant presented to the emergency room showing signs of respiratory distress," id. at 168, the Court observed that "the standard of care for the medical procedure at issue was the same with regard to [the expert's] specialties and [the defendant's] specialty." Id. at 169. Because the expert performed the procedure at issue in the case under the same standard of care that governed the defendant's performance of that procedure, the Court held that he satisfied the active clinical practice requirement.

Finally, the Court's decision in Hinkley "addressed whether an expert who only taught and consulted in a defendant's specialty or a related field of medicine during the statutory one-year window nevertheless had an 'active clinical practice' within the contemplation of Code §

10

8.01-581.20(A)." 606 S.E.2d at 807. In that case, the plaintiff, who alleged that the defendant doctor had improperly failed to provide testing and to deliver pre-natal twins before they both died in utero, proffered an expert to testify regarding the standard of care in the field of obstetrics. The proffered expert consulted heavily on high-risk pregnancies with the partners in his medical practice, was extremely active in teaching obstetrics and gynecology to residents and students as an associate clinical professor at a medical school, and served on the editorial board of a related medical journal. Id. at 805. Despite his background, the Court held that he had been improperly permitted to testify because he did not have an "active clinical practice." Noting that the crux of the case was whether the defendant doctor had provided appropriate "direct patient care," the Court held that the expert could not testify on this issue because he had not been the primary care physician for any pregnant mother or actually delivered a baby within a year of the allegedly negligent conduct at issue in the case. Id. at 807.

Together, these cases elucidate two principles that control the court's analysis here. First, the court must look to the parties' allegations to determine the medical procedure that is "at issue in the case at bar." Wright, 593 S.E.2d at 313. Simply because the expert may be qualified to testify with regard to a medical procedure that is potentially relevant to the case at hand but not actually in dispute between the parties does not grant the court license to declare his competence on that issue. Thus, in Wright, the Court looked both to the plaintiff's pleadings and to the allegations in her motion for judgment in order to determine that "the acts Wright claims form the basis of her action and violate the standard of care are medical procedures applicable during laparoscopic surgery in the female pelvic region in the vicinity of the bladder." Id. See also id. at 312. Affidavits from the proffered expert may also guide the determination of the precise medical

11

procedure that the plaintiffs are putting into issue in a given case. See Lloyd, 654 S.E.2d at 571.

Second, an expert satisfies the active clinical practice requirement with respect to the relevant medical procedure only if "the expert performs the procedure at issue and the standard of care for performing the procedures is the same." Sami, 535 S.E.2d at 175. Even though the Sami court was determining whether an expert had an active clinical practice in a "related field of practice" rather than in the defendant's "specialty," there is no reason to assume that Virginia courts would construe the latter more broadly than the former. Indeed, as a general matter, the cases construing the active clinical practice requirement center their analysis on whether the proferred expert has timely performed the requisite procedure under the same standard of care that governed the defendant's performance. For example, in Griffett v. Ryan, 443 S.E.2d 149 (Va. 1994), the Court held that a physician who specialized in internal medicine was qualified to testify as an expert regarding the standard of care governing the review of chest x-rays by a gastroenterologist (a subspecialty of internal medicine) because "the duty to review an x-ray contained in a patient's medical record [does not] vary between an internist and a gastroenterologist." Id. at 153. The Griffett court immediately cautioned, however, that, despite the substantial overlap between the two specialties, "there are certain standards of care imposed upon a gastroenterologist on which an internist simply would not be qualified to render an opinion." Id. at 154. The Court recognized, in other words, that a specialist may not be qualified to testify as an expert on the standard of care governing a sub-specialist's performance of a particular procedure if the duties imposed upon the two specialists with respect to that procedure are not identical. Id. See also Jackson, 671 S.E.2d at 169; Lloyd, 654 S.E.2d at 571; Sami, 535 S.E.2d at 175.

12

The court therefore concludes that a witness maintains an active clinical practice in the defendant's "specialty" for purposes of § 8.01-581.20(A) only if he performs the same medical procedure under the same standard of care that governs the defendant's performance of that procedure. If, on the other hand, the standard of care differs between the proferred expert's performance and the defendant's performance of an otherwise similar procedure, § 8.01-581.20(A) bars the proferred expert from testifying with respect to the standard of care governing that procedure.

IV.    **Analysis**

Applying these principles to the case before the court, the court concludes that Dr. Walker does not have an active clinical practice in either of the medical procedures at issue in this action. The plaintiffs believe that Wright controls the disposition of this matter and rely upon Wright to argue that the "medical procedure" at issue in the instant case should be construed more broadly than simply the repair of a descending thoracic aortic aneurysm occurring between T8 and T12. As was the case in Wright, Dr. Walker's proferred testimony primarily seeks to opine that Dr. Baker was negligent in failing to take certain specified measures to protect organs that were separate from the operative field. See Wright, 593 S.E.2d at 312. Dr. Walker's Rule 26 disclosures note his opinion that Dr. Baker did not use "well-documented maneuvers to mitigate against [spinal cord injury]," including "CSF drainage," "distal circulatory support," "pre-operative identification of the blood supply to the spinal cord via MRA or CTA," and "intra-operative monitoring of . . . evoked potentials." See Def. Br. Ex. B at 3. With the exception of the monitoring of evoked potentials, none of these mitigative methods appears to be limited in application only to the repair of a descending thoracic aortic aneurysm occurring between T8 and

13

T12. See Walker Aff. at ¶¶ 10, 19. In fact, Dr. Walker himself uses each of these precautionary measures—with the notable exception of the monitoring of evoked potentials—when he operates on proximal descending thoracic aneurysms in the T3-to-T5 region in order to ensure that the spinal cord is not injured during the operation. Id. at ¶¶ 18, 19.

The plaintiffs therefore argue that the relevant medical procedure at issue in this case is not the repair of a descending thoracic aneurysm in the T8-to-T12 region, but rather the repair of any type of descending thoracic aortic aneurysm, because all such repairs require the use of these particular protective measures in order to reduce the risk of injury to the spinal cord. On this argument, Dr. Walker would qualify as an expert under § 8.01-581.20(A) because he still operates on descending thoracic aortic aneurysms that present a risk of spinal cord injury and require use of the same types of protective measures that he opines should have been used by Dr. Baker. See Walker Aff. at ¶¶ 18, 19. Consequently, argue the plaintiffs, Dr. Walker is qualified to testify as to the standard of care governing these procedures, including his opinion that each of these protective measures must be implemented to reduce the risk of spinal cord injury.

The difficulty with the plaintiffs' position, however, is that Wright involved a case in which the plaintiff's allegations had framed the negligence inquiry with respect to a medical procedure that was more general than the particular "pathology" of the operation performed in that case. Wright, 593 S.E.2d at 314. The Wright court stressed that the plaintiff did not allege that the defendant breached a standard of care that was unique to the particular type of surgery performed in that case—the excision of a urachal cyst. Rather, the plaintiff claimed that the injury was caused by the defendant's failure to take the care with respect to the surrounding environs that is generally required of laparoscopic surgery in that region. Wright, 593 S.E.2d at 312. Essentially,

14

the plaintiff alleged that, no matter what a doctor is doing with the stapler in that region, she always must be equally careful not to hit the bladder. The defendant offered no evidence to suggest that the risk of bladder injury was any more elevated with regard to the removal of a urachal cyst than with regard to any other type of female pelvic laparoscopic surgery. Id. at 312. Thus, it was undisputed that the laparoscopic procedures performed by the experts and the particular cyst excision performed by the defendant posed an identical degree of risk to the surrounding organs and that therefore the same standard of care governed each of the procedures. Id. Based on these allegations, the Court held that the medical procedure at issue in Wright was laparoscopic surgery in the female pelvic region in general, rather than the urachal cyst surgery that was specifically performed by the defendant. Id. at 314.

Unfortunately for the plaintiffs, the focus drawn by the plaintiffs in the present case is precisely the opposite of that in Wright. Unlike in Wright, the plaintiffs' theory of negligence rests upon the particular pathology of the precise procedure performed by Dr. Baker; it targets the performance of the specific procedure, not just the general procedure which is inclusive of the specific. The plaintiffs have not alleged that Dr. Baker failed to abide by the standard of care governing the surgical repair of any thoracic aortic aneurysm, regardless of whether it involves a low-risk aneurysm or a high-risk descending thoracic aneurysm in the T8-to-T12 region. Instead, the complaint alleges only that the defendants "failed to properly perform the surgery which was attempted." (Compl. at ¶ 20.) That surgery, of course, was the "repair of [Ms. Workman's] thoracoabdominal aortic aneurysm"—i.e., the repair of an aortic aneurysm in the lower thoracic region that carries an elevated risk of spinal cord injury. (Compl. at ¶ 10.) Nowhere have the plaintiffs alleged that Dr. Baker violated the general standard of care relevant to all thoracic

aneurysm repairs that pose some risk of spinal cord injury; they have claimed throughout this suit only that he violated the standard of care relevant to the particular type of surgery that he actually performed upon Ms. Workman. In fact, the plaintiffs stress that Dr. Baker was negligent because he failed to implement the "additional protective measures" mandated by the unique standard of care pertaining to higher-risk aneurysm surgeries. See Pl. Br. at 4; Walker Aff. at 13. While certainly claiming on brief that "the relevant medical procedure here . . . involves the management and surgical treatment of patients with aortic aneurysms," see Pl. Br. at 9, the plaintiffs have continued to argue before this court that Dr. Baker was negligent in failing to abide by the standard of care that is unique to aortic aneurysm surgeries between T8 and T12. See id. at 4. Notwithstanding the plaintiffs' asseverations on brief, therefore, it appears from the record that the general standard of care governing all aortic aneurysm repairs that pose some non-trivial risk of spinal cord injury is not at issue in this case. Instead, the plaintiffs have narrowly focused their allegations on the precise pathology of the procedure that was performed by Dr. Baker in this case; namely, the repair of descending thoracic aortic aneurysms between T8 and T12.

Furthermore, it is clear that the plaintiffs themselves have established a "significant medical distinction" between the descending thoracic aortic aneurysm repairs performed by Dr. Walker and Dr. Baker's repair of Ms. Workman's descending thoracic aortic aneurysm. Wright, 593 S.E.2d at 314 n.5. Unlike in Wright, the likelihood of harm to organs outside the operative field differs in this case between the procedures performed by the proferred expert and the procedure performed by the defendant. The parties do not dispute that descending thoracic aortic aneurysm repair in the lower thoracic region (i.e., between T8 and T12) presents a higher risk of spinal cord injury than does the repair of other types of descending thoracic aortic aneurysms. See

16

Ailawadi Dep. at 45 ("Descending thoracic aneurysms are far different, more complex. . . . There's a lot more to consider and plan preoperatively in terms of where the aneurysm begins and ends [and regarding] what type of adjunct you are going to use . . . to preserve the spinal cord."); Walker Aff. at ¶ 13 ("Aortic aneurysm surgeries between T8-T12 carry a higher risk of spinal cord injury than those at other areas of the aorta."). Compare Wright, 593 S.E.2d at 312.

Nor is there any dispute between the parties that, because repairing thoracic aneurysms between T8 and T12 carries a higher risk of spinal cord injury than does the repair of thoracic aneurysms between T3 and T5, a different standard of care applies to the former than to the latter. In this context, the court notes that Dr. Walker himself has indicated that the standard of care pertaining to the operations performed by Dr. Baker is higher than the standard of care governing the procedures that Dr. Walker currently conducts: "Because of the higher risk of spinal cord injury when operating on aortic aneurysms at [the T8-to-T12] levels, the standard of care requires the use of additional protective measures." (Walker Aff. at ¶ 13.) Indeed, one of the reasons that Dr. Walker stopped performing surgery on these types of descending thoracic aneurysms was that his practice did not have the capacity to monitor evoked potentials. (Walker Dep. at 28.) Because he felt that it fell below the requisite standard of care to perform a descending thoracic aneurysm repair in the T8-to-T12 region without monitoring evoked potentials, he "couldn't in good conscience do these operations." Id. at 29. Conversely, he feels no qualms about continuing to conduct repairs between T3 and T5 on proximal descending thoracic aortic aneurysms and ascending thoracic aneurysms—both of which still present some risk of spinal cord injury—despite his practice's inability to monitor evoked potentials. See Walker Aff. at ¶ 3; id. at ¶ 19 ("The only tool I do not use in my practice on other types of aortic aneurysm repairs is

monitoring the evoked potentials, which should be used for the type of repair Ms. Workman had."). As Dr. Walker himself has made plain, therefore, the elevated risk that attends a descending thoracic aneurysm repair between T8 and T12 mandates that the operating surgeon abide by a different standard of care than is applicable to the lesser risk that attends the surgical repair of a thoracic aneurysm between T3 and T5. Compare Wright, 593 S.E.2d at 312 ("The record does not reflect evidence establishing a unique standard of care for urachal cyst surgery as it relates to the injury of the bladder or other organs outside that operative field which differs from the standard of care for other surgery adjoining the bladder.").

To be sure, the Wright court—in keeping with its decision that a proferred expert need not have performed the procedure "with the same pathology in all respects as gave rise to the alleged act of malpractice at issue"—explicitly rejected the argument that § 8.01-581.20(A) required a hypothetical expert testifying as to the treatment of a herniated disc at L4 "to have actually treated a disc at L4 and not L5 or L3." 593 S.E.2d at 314. But in rejecting that argument, the Court noted that the outcome in the case might be different if "expert testimony . . . establish[ed] a significant medical distinction for a differing standard of care between a medical procedure at L3 as opposed to L4." Id. at 314 n. 5. Id. See also Lloyd, 654 S.E.2d at 571 (allowing a neurologist to testify on the standard of care governing a procedure performed by an orthopaedist because there was no "medical distinction" between the standard of care governing the different specialists' performance of the same procedure).

This, of course, is exactly the case here. The corollary is obvious: because the plaintiffs have admitted that there is a "significant medical distinction" between the two procedures and in fact predicate their theory of negligence upon the duties that uniquely apply to the defendant's

18

conduct, their suit cannot be deemed to allege that Dr. Baker failed to abide by the standard of care generally pertaining to the repair of descending thoracic aortic aneurysms in both low- and high-risk scenarios. Wright, 593 S.E.2d at 314 n.5. A review of the allegations in this case compels the court to conclude that the plaintiffs have put into issue not the standard of care governing the repair of descending thoracic aortic aneurysms in general, but rather the standard of care uniquely governing the repair of a descending thoracic aortic aneurysm in the T8-to-T12 region.

The court is therefore constrained to conclude that Dr. Walker is not qualified under § 8.01-581.20(A) to testify as an expert on the standard of care governing Dr. Baker's repair of Ms. Workman's descending thoracic aortic aneurysm. The plaintiffs have alleged only that Dr. Baker's conduct ran afoul of the standard of care uniquely applicable to the repair of elevated-risk descending thoracic aortic aneurysms in the T8-to-T12 region. Dr. Walker himself has admitted that the standard of care governing such a procedure is different than the standard of care governing the procedures he conducted during the statutory time-frame. As explained above, Wright has in no way altered the Supreme Court of Virginia's mandate that § 8.01-581.20(A) is satisfied only if "the expert performs the procedure at issue and the standard of care for performing the procedures is the same." Sami, 535 S.E.2d at 175. See also Wright, 593 S.E.2d at 314 n. 5; Lloyd, 654 S.E.2d at 571 (allowing a neurologist to testify on the standard of care governing a procedure performed by an orthopaedist because there was no "medical distinction" between the standard of care governing the different specialists' performance of the same procedure). As a result, because Dr. Walker did not perform a surgical repair of a descending thoracic aortic aneurysm in the T8-to-T12 region within one year of Ms. Workman's surgery, he

19

has not engaged in an active clinical practice within the requisite time-frame with respect to that procedure. As the defendants correctly note, any indication that Dr. Walker has continued to provide consultation with regard to heightened-risk aneurysm repairs does not satisfy the requirements of the statute. See Hinkley, 606 S.E.2d at 807; Dunston v. Huang, --- F.Supp.2d ----, 2010 WL 2163940, at *4 (E.D. Va. 2010) (construing Hinkley as excluding expert testimony on the basis that teaching and consulting activities are not "direct patient care"). Accordingly, Dr. Walker is not qualified to testify on the standard of care relating to Dr. Baker's repair of Ms. Workman's descending thoracic aortic aneurysm.

For the same reasons, Dr. Walker is not qualified to testify on the standard of care governing the informed consent process within the context of a descending thoracic aneurysm repair in the T8-to-T12 region. The plaintiffs have alleged that the elevated risks associated with such a repair impose a heightened standard of care upon the communication of those risks in the context of such a surgery, and that Dr. Baker was negligent in failing to abide by this elevated standard of care. See Compl. at ¶ 11; Def. Br. Ex. B at 2-3 (faulting Dr. Baker for failing to document and fully explain to Ms. Workman that "there is a risk of [spinal cord injury] of 5%-10% with this operation"; Walker Dep. at 22 (stressing the "known definite risk of paraplegia" associated with this particular surgery); Walker Aff. at ¶ 21 (describing the "heightened risk of spinal cord injury" as a salient risk of a descending thoracic aortic aneurysm repair). Because Dr. Walker did not obtain, within a year of Ms. Workman's operation, informed consent from a patient contemplating a heightened-risk repair of a descending thoracic aortic aneurysm in the T8-to-T12 region, he is not qualified as an expert under § 8.01-581.20(A) on the standard of care governing this procedure. See Dunston, 2010 WL 2163940, at *5 (holding that, to satisfy the

20

active clinical practice requirement, the plaintiff's expert must have obtained informed consent from a patient in the context of performing an epidural steroid injection where the plaintiff argued that the defendant negligently failed to inform a patient that a thoracic transforaminal epidural steroid injection posed a "higher risk of paralysis than other possible approaches").

Ironically, therefore, even though there is no dispute that Dr. Walker has actually demonstrated expert knowledge of the standard of care governing the particular procedure performed by Dr. Baker, § 8.01-581.20(A) bars Dr. Walker from opining on the standard of care governing the particular medical procedures at issue in this case; namely, the repair of a descending thoracic aortic aneurysm in the T8-to-T12 region and the procurement of informed consent from a patient about to undergo such an operation. As has been noted, the result in this case may have been different had the plaintiffs simply pled negligence in the performance of a thoracic aneurysm repair, given that Dr. Walker appears qualified under § 8.01-581.20(A) to testify regarding the general standard of care applicable to thoracic aneurysm repairs in general. See Wright, 593 S.E.2d at 313 (noting that the result in the case may have been different if it had been pled differently). However, inasmuch as the plaintiffs' complaint focuses on the standard of care attendant to high-risk descending thoracic aortic aneurysm repairs at T8-T12, the court will not stray from the pleadings and allegations in order to re-characterize the medical procedure that is at issue in the case at bar.[2]

---

[2]Although the plaintiffs also intimate on brief that Dr. Baker was negligent in deciding to perform the surgery upon Ms. Workman in the first place, given his practice's low volume of such patients, neither the complaint nor Dr. Walker's Rule 26 disclosures indicate that the plaintiff is pursuing this theory of negligence against Dr. Baker. As a result, this claim is also not at issue in this case, even though there is a colorable argument that Dr. Walker is qualified to opine upon it. See Dunston v. Huang, --- F. Supp. 2d ----, 2010 WL 2163940, at *4 (E.D. Va. 2010) (noting that the issue on this claim is the requisite care to be exercised in deciding whether to perform a descending thoracic aneurysm repair, not the care to be exercised in actually conducting such a repair).

This conclusion does not compel the court to grant the defendant's motion for summary judgment, however. At oral argument on the motion before the court, the court indicated that, if the plaintiffs sought a continuance in order to designate a new expert who qualifies to testify with regard to the specific procedures at issue in this case, they would be granted leave to do so. Accordingly, the court will take the motion to exclude the plaintiffs' preferred witness and the motion for summary judgment under advisement until October 18, 2010. Should the plaintiffs seek to designate a new expert witness, they must formally move for continuance of trial and leave to designate a new expert. If the plaintiffs have not sought a continuance by October 18, 2010, the defendants' motions will be granted, based on the plaintiffs' failure to forecast expert testimony regarding the standard of care pertaining to the particular procedure at issue in the plaintiffs' complaint.

## V.    **Conclusion**

For the foregoing reasons, the court will take under advisement until October 18, 2010 the defendants' motion to exclude the plaintiffs' preferred witness and the defendants' motion for summary judgment.

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This _13ᵗ__ day of October, 2010.

_____
Chief United States District Judge